UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

MICHELLE PIERCE,

        Plaintiff,

    v.

BETH WILNER and FAMILIES IN
TRANSITION, INC.,

        Defendants.

No. 21 CV 1985

Judge Manish S. Shah

**MEMORANDUM OPINION AND ORDER**

A court awarded plaintiff Michelle Pierce joint custody of her son and appointed defendants Beth Wilner and Families in Transition to the role of "parenting coordinator." A local court rule and the parties' written agreement said that Wilner couldn't opine as to who should have custody of Pierce's son. But in two reports filed with the state court, Wilner said that sole custody of Pierce's son should go to his father. Pierce sues defendants for breach of contract.[1] Both parties move for summary judgment under Federal Rule of Civil Procedure 56. For the reasons discussed below, defendants' motion is granted, and plaintiff's motion is denied.

---

[1] This court has jurisdiction because Pierce is a citizen of Wisconsin, defendants are citizens of Illinois, and the amount in controversy is more than $75,000. [2] ¶¶ 4, 7; [8] ¶¶ 1–2; 28 U.S.C. § 1332(a)(1). Illinois law applies. *See Paulsen v. Abbott Laboratories*, 39 F.4th 473, 477 (7th Cir. 2022) (citations omitted) (noting that federal courts sitting in diversity apply the choice of law rules of the forum state, and under Illinois choice-of-law rules, the forum state's law applies unless an actual conflict is shown or the parties agree that forum law doesn't apply).

## I.     Legal Standards

A party moving for summary judgment must show that there is no genuine dispute about any material fact and that they are entitled to judgment as a matter of law. Fed. R. Civ. P. 56. The moving party must demonstrate that, after construing all facts and drawing all reasonable inferences in favor of the nonmovant, a jury could not return a verdict for the nonmoving party. *Birch|Rea Partners, Inc. v. Regent Bank*, 27 F.4th 1245, 1249 (7th Cir. 2022); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247–49 (1986). Or the moving party must show that the nonmoving party has failed to establish an essential element of their case and could not carry their burden of proof at trial. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23 (1986). I need only consider the cited materials, but I may consider "other materials in the record." Fed. R. Civ. P. 56(c)(3). These standards apply equally to cross-motions for summary judgment, *Blow v. Bijora, Inc.*, 855 F.3d 793, 797 (7th Cir. 2017), and I consider evidence from both motions to ensure that there is no material dispute. *Torry v. City of Chicago*, 932 F.3d 579, 584 (7th Cir. 2019).

## II.     Background

Michelle Pierce and Richard Addante had a son named Matthew. *See* [65] ¶ 1.[2] Pierce initially had sole custody of Matthew, who was a minor until 2014. *See id.*

---

[2] Bracketed numbers refer to entries on the district court docket. Referenced page numbers are taken from the CM/ECF header placed at the top of filings, except in the case of citations to depositions, which use the deposition transcript's original page number. The facts are largely taken from defendants' response to plaintiff's Local Rule 56.1 statement, [70], plaintiff's response to defendants' statement, [65], and defendants' response to plaintiff's additional statement, [75], where the asserted fact and the opponent's response are in one document. I also consider "other materials in the record" as appropriate. Fed. R. Civ.

¶¶ 2–3. In January 2007, however, Addante filed for custody in the Circuit Court of Cook County. *Id.* ¶¶ 4–6.[3] In May 2008, following a recommendation from Pierce's attorneys, a custody evaluator was appointed. *See id.* ¶¶ 7–8. In December, the court appointed an attorney as Matthew's child representative. *See id.* ¶ 9.

In August 2009, the custody evaluator issued a report, concluding that Addante should have sole custody. [65] ¶¶ 10–11.[4] The evaluator wrote that Pierce's inability to coparent with Addante was harming their son's emotional well-being. *Id.* ¶ 12. Two months later, the child representative filed an emergency motion, asking the court to award custody to Addante. *Id.* ¶¶ 13–14. Pierce didn't immediately respond to the child representative's motion, but filed a motion to strike on October 26. *See* [65] ¶ 14; [70] ¶ 24. The court initially ordered that physical custody of Matthew be given to Addante, and that Pierce's visits with her son be supervised. *See* [65] ¶ 15. After a hearing, however, the court ultimately denied the child representative's motion. *Id.* ¶ 16.

---

P. 56(c)(3). Any fact not properly controverted is admitted. N.D. Ill. Local R. 56.1(e)(3). I ignore legal arguments in the statements of facts and any facts included in response to an asserted fact that do not controvert the asserted fact. N.D. Ill. Local R. 56.1(d)(4), (e)(2); *see, e.g.,* [70] ¶¶ 5–9, 12, 14–15, 29, 31, 39–40, 44–45; [65] ¶ 29; [75] ¶¶ 4, 14–15. Unsupported assertions are disregarded. *See* N.D. Ill. Local R. 56.1(d)(2–3); Fed. R. Civ. P. 56(c)(1)(A); *see, e.g.,* [70] ¶¶ 20–21, 32, 34; [75] ¶¶ 4, 12.

[3] Defendants assert facts about the custody proceedings before Wilner's involvement. *See* [65] ¶¶ 5–16. While not material to the dispute, these facts are relevant insofar as they establish Pierce's legal position in the custody battle at the time of Wilner's involvement. Plaintiff's objection is overruled. *See* [65] at 2.

[4] The report was dated August 2009. *See* [70-1] at 35. That the circuit court ultimately found the report prejudicial and refused to allow the parties to disclose it without a court order, *see* [65] ¶ 10; [75] ¶ 16, isn't a reason to exclude it in this case. The report is relevant to the circumstances of the custody battle between Pierce and Addante. Plaintiff's objection, *see* [65] ¶¶ 10–12, is overruled.

In May 2010, the court awarded joint custody of Matthew to both of his parents. *See* [65] ¶ 17; [56-1] at 38–39. In the same order, the court appointed defendant Beth Wilner (who worked for defendant Families in Transition) to be the parenting coordinator. [65] ¶ 18; [70] ¶¶ 1–2; *see* [56-1] at 49. Defendants accepted the appointment, [70] ¶ 3, which did not have a specified end date. *See* [75] ¶ 13. The court's order said that Wilner would "coordinate parenting time," "oversee the general psychological, educational and psychiatric treatment of Matthew," mediate disputes between Addante and Pierce including about "the parenting schedule and the implementation thereof," and make final and binding decisions on issues submitted to her. *See* [65] ¶ 19; [70] ¶ 2; [56-1] at 44, 49. Wilner was to report any non-compliance or lack of follow-through by either parent to Matthew's child representative. [65] ¶ 20. Pierce and Addante were to be equally responsible for the costs of mediation, and for other costs incurred pursuant to the order. *Id.* ¶ 21; *see* [56-1] at 50.

Circuit Court of Cook County Local Rule 13.10 described the appointment and duties of parenting coordinators. *See* [65] ¶ 22; [61-1] at 3–4. The Local Rule said that a parenting coordinator was to "educate, mediate, monitor court orders and make recommendations to the court as necessary." [61-1] at 3; [65] ¶ 22. A parenting coordinator was also permitted to "mediate disputes concerning parenting issues," "report any allegations of noncompliance to the court," and "recommend detailed guidelines or rules for communication between parents." [61-1] at 3; [65] ¶ 22. But a parenting coordinator was not "permitted to give a recommendation or opinion

4

concerning the ultimate issue of fact, law, or mixed issue of fact and law as to child custody." [61-1] at 4; *see* [70] ¶ 3; [65] ¶ 23. Wilner understood that parenting coordinators were not to make custody recommendations to the court. [70] ¶ 4.[5]

On May 7, Wilner met with Pierce and presented her with a Parenting Coordination and Retainer Agreement. *See* [70] ¶ 5. Wilner explained the terms of the agreement, which included the following provision: "You [Pierce] also understand that I [Wilner] will not willingly testify in court on [behalf of either Pierce or Addante] nor will I [Wilner] render an opinion regarding custody." *See id.*; [65] ¶ 27; [56-1] at 257–58. The agreement also said that Wilner would handle disputes about Matthew before they were submitted to the court, that Pierce agreed to attend and engage in sessions with Wilner, and outlined Wilner's fee, retainer, and billing requirements. [65] ¶¶ 25–28. Pierce signed the agreement, and paid Wilner $200. *See* [70] ¶ 7; [65] ¶ 24. Addante signed an identical agreement. [65] ¶ 30.

Over the next several months, Wilner communicated regularly with Pierce, Addante, and Matthew. *See* [65] ¶ 31. But Wilner spoke with Addante much more than with Pierce. *See* [75] ¶¶ 1–3; [70] ¶ 27. On August 19, Wilner prepared a report on Pierce's case. [70] ¶ 10; [65] ¶ 32.[6] As part of the report, Wilner wrote that "[i]t is

---

[5] As parenting coordinator, Wilner said that she acted in Matthew's best interests and that her duties included mediating disputes between Addante and Pierce. *See* [65] ¶ 29. But the records cited—[61-1] at 167, 186–87—don't show that Wilner was required to act in Matthew's best interest.

[6] The record cited by defendants doesn't show why Wilner prepared her first report. *See* [65] ¶ 32; [61-1] at 113. Another record—Wilner's addendum to her initial report—shows that both documents were requested by Matthew's child representative. *See* [65] ¶ 36; [61-1] at 293. The child representative did not recall asking Wilner for the reports. *See* [56-1] at 358,

this [parenting coordinator's] firm opinion that maintaining joint custody is untenable," and that "[e]ffective immediately, this [parenting coordinator] recommends sole custody for Mr. Addante regarding medical and educational decisions." [70] ¶ 11; [65] ¶ 33; [56-1] at 263.

A month later, at the request of the child representative, Wilner prepared an addendum to her report. *See* [65] ¶¶ 36–37, 40; [70] ¶¶ 13–14, 17. In this second document, Wilner wrote that Addante and Pierce weren't cooperating, which was harming Matthew. *See* [61-1] at 293–95; [65] ¶¶ 37–38. The addendum laid out various problems with Pierce's parenting and communication with Addante. [65] ¶ 41. Wilner wrote that "Mr. Addante should be awarded sole custody, such that he may make unilateral parenting decisions regarding medical and educational issues, without the need to first consult with Ms. Pierce." [70] ¶ 16; [65] ¶¶ 39, 44; [56-1] at 268. The addendum said that there was a "strong case for changing joint custody to sole custody" but that Wilner did not believe there should be "a change in parenting time at the start of [Pierce's son's] freshman year of [high school]." *See* [70] ¶ 15; [56-1] at 267.[7]

---

Dep. at 44–45. The judge in the custody case did not ask Wilner to make any custody determination. [75] ¶ 5.

[7] Portions of the report and addendum reflected Wilner's opinion on the custody arrangement for Pierce's child. *See* [70] ¶¶ 12, 14–15, 27, 38. Before making her recommendations as to a change in custody, Wilner didn't investigate whether there was anyone else living in Addante's home. *See* [75] ¶ 8. Wilner said she had no knowledge of anyone else living with Addante, and Matthew's child representative said that she believed Addante's stepson was no longer living with him. *See id.* ¶¶ 9–10. Wilner had no ill-will or malice towards Pierce. *See* [65] ¶ 45.

Matthew's child representative and Addante filed an emergency petition in the circuit court, seeking sole custody of Pierce's son for Addante, and attached Wilner's report and addendum to the motion. *See* [70] ¶ 18; [65] ¶¶ 34–35; [56-1] at 376–80, 395–99, 402–06. The child representative wanted the court to order a new custody arrangement in accordance with Wilner's written recommendations, and laid out her position on the motion in writing. *See* [70] ¶¶ 36–37.

Pierce's attorneys failed to immediately oppose the motion and didn't timely depose Wilner. *See* [65] ¶ 42. On September 23, the court issued an order restricting Pierce's parenting time with her son: she was no longer permitted to have overnight visits on weekdays. [70] ¶ 18; [65] ¶ 43; [56-1] at 272–73. The court set a trial date to decide the issue on a permanent basis. *See* [65] ¶ 46.

Pierce was upset after learning about the change and losing time with her son: she cried and was frustrated, felt like vomiting, shook with anxiety and worry, had difficulty breathing, tightness in her chest, had trouble sleeping, and lost weight. *See* [70] ¶ 22; [56-1] at 310–11, Dep. at 13–14. Because Wilner sent her reports to Matthew's child representative, Pierce rehired her former attorney. *See* [70] ¶ 19.[8]

---

[8] The records cited by defendants don't show that Pierce had a continual working relationship with her attorney during the period in question. *See* [61-1] at 252–53. Plaintiff's fact, [70] ¶ 19, is admitted. Plaintiff asserts facts about her son's reaction to the change in custody arrangements and an opinion about the situation offered by Matthew's therapist. *See* [70] ¶¶ 20–21, 23, 27–28. None of these facts are relevant. At issue are potential damages to Pierce, not to her son. Facts about Pierce's emotional damages are potentially relevant in a breach of contract case. *See Parks v. Wells Fargo Home Mortg., Inc.*, 398 F.3d 937, 940 (7th Cir. 2005) (quoting *Maere v. Churchill*, 116 Ill.App.3d 939, 944 (3d Dist. 1983)). Defendants' objections are overruled. *See* [70] ¶¶ 22, 34.

On or about October 21, Pierce met with Wilner. *See* [70] ¶ 25. Wilner asked Pierce if Pierce was sure she wanted to contest the custody dispute further "because I'm going to say sole custody to Addante and it's going to cost a lot of money." *See id.*; [56-1] at 15–16. Pierce responded that she didn't care about the money and that she and Wilner were "in a contract." *See* [70] ¶ 25; [56-1] at 16.[9] On October 27, Pierce moved to strike the emergency petitions for sole custody made by Addante and the child representative. *See* [70] ¶ 24.

On January 3, 2011, the state court held a pretrial conference. *See* [65] ¶ 47. In attendance were Matthew's child representative, attorneys for Pierce and Addante, and Wilner. *Id.* ¶ 48; [70] ¶ 29.[10] Wilner told the court her opinion of the case, *see* [61-1] at 184–85, Dep. at 105–09, and after the conference, the judge awarded sole custody of Matthew to Addante. *See id.* A week later, the court issued a

---

[9] Defendants' hearsay objections, [70] ¶ 25, are overruled. Wilner's statement isn't hearsay because it falls under the opposing party exception. *See* Fed. R. Evid. 801(d)(2)(A). What Pierce said is admissible if offered for its effect on Wilner (but not for the truth of the matter asserted) because Pierce had personal knowledge of the conversation and Wilner's understanding of the nature of the parenting coordination agreement with Pierce is relevant. *See* Fed. R. Civ. P. 56(c)(4) ("An affidavit or declaration used to support or oppose a motion must be made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant or declarant is competent to testify on the matters stated."); *United States v. Shaw*, 824 F.3d 624, 630 (7th Cir. 2016) (noting that statements offered to demonstrate the effect on the listener are not hearsay).

[10] There's a dispute as to why Wilner attended the pretrial conference. *See* [65] ¶ 49. Wilner said she couldn't remember who asked her to attend, but also that she was asked to attend by Matthew's child representative, who was making the invitation on behalf of the judge. *See* [65] ¶ 49; [75] ¶¶ 5–6; [61-1] at 181–183, Dep. at 92–97. Wilner wasn't subpoenaed to testify. *See* [70] ¶ 30. Facts concerning Wilner's appearance and the circumstances of the hearing are relevant as to how defendants provided parenting coordination services. Defendants' objections, *see* [70] ¶¶ 30, 33, are overruled. Plaintiff hasn't shown that she or her husband had personal knowledge as to what was said in the pretrial conference, when they weren't present. *See* [70] ¶ 32; [65] ¶ 48.

written order, confirming that Addante would have sole custody of Matthew. [65] ¶¶ 50–51; [70] ¶ 35. The court also ordered that Addante and Pierce would be equally responsible for the costs of parenting coordination. [61-1] at 124; [65] ¶ 52.[11]

Defendants charged Pierce $1,200 for "[c]ourt appearance and testimony" rendered on January 3, 2011, and described the services as "Court appearance and testimony on 1/3/11." [70] ¶ 31. Pierce eventually paid defendants more than $9,800 for parenting coordination services. *See id.* ¶ 8. Pierce was unhappy with Wilner's performance as a parenting coordinator, and wanted to terminate her services. *See* [65] ¶¶ 56–57. Wilner stopped serving as a parenting coordinator for Pierce's family in May 2011. [75] ¶ 11. In November 2011, Pierce was ordered to pay child support to Addante. *See* [70] ¶ 39.

In further litigation, Pierce continued to seek custody of her son. *See* [70] ¶ 43; [75] ¶¶ 17–19.[12] After losing custody of Matthew, Pierce was emotionally devastated,

---

[11] Matthew's child representative could not remember whether the court provided a reason for its ruling. [65] ¶ 55. What the judge told Pierce after the pretrial conference is inadmissible as hearsay and is not a public record excepted from the rule. *See* [70] ¶ 32; Fed. R. Evid. 801, 803(8); *see also Gen. Elec. Cap. Corp. v. Lease Resol. Corp.*, 128 F.3d 1074, 1081 (7th Cir. 1997) (quoting 21 Charles A. Wright & Kenneth W. Graham, Jr., *Federal Practice and Procedure* § 5106 (1st ed. 1977 & Supp. 1997)) ("The most frequent use of judicial notice of ascertainable facts is in noticing the contents of court records."). (But, in any event, there is no dispute that the judge awarded sole custody to Addante and that Wilner recommended sole custody.) There's an immaterial dispute as to whether a hearing was held on January 3, or merely the pretrial conference. *See* [70] ¶ 33; [61-1] at 185–86, Dep. at 109–10. The parties waived their right to appeal the order, over Pierce's objection. [65] ¶ 53; [75] ¶ 7; [66-2] at 17.

[12] That Pierce brought a malpractice lawsuit against her attorney and had opinions as to why she had lost custody of her son, *see* [65] ¶¶ 58–64, isn't relevant in this case. Pierce's opinions aren't evidence as to what caused the judge in the custody case to make any ruling.

lost her job three months later, was forced to sell retirement investments, and couldn't find a comparable position. *See* [70] ¶¶ 34, 40–42.[13]

## III. Analysis

### A. Quasi-Judicial Immunity

Judges are immune from liability for actions performed as part of their judicial duties. *Nichols v. Fahrenkamp*, 442 Ill.Dec. 444, 449 (2019) (citing *Pierson v. Ray*, 386 U.S. 547, 553–54 (1967)). This immunity also extends to other actors in the judicial process, because their work "should be free of the harassment and intimidation associated with litigation." *Zoretic v. Darge*, 832 F.3d 639, 643 (7th Cir. 2016) (quoting *Richman v. Sheahan*, 270 F.3d 430, 435 (7th Cir. 2001)); *see Nichols*, 442 Ill.Dec. at 449 (citing *Rehberg v. Paulk*, 566 U.S. 356, 366–67 (2012), *Briscoe v. LaHue*, 460 U.S. 325, 335 (1983), and *Butz v. Economou*, 438 U.S. 478, 513 (1978)). Officials associated with the court are entitled to immunity either when they (1) perform discretionary functions such as resolving disputes, which are similar to those a judge performs, or (2) perform a non-discretionary or administrative function at the explicit direction of a judicial officer. *See Zoretic*, 832 F.3d at 643–44 (quoting *Snyder v. Nolen*, 380 F.3d

---

[13] Between 2004 and 2011, Pierce worked for a company that made orthodontic devices. [65] ¶ 68. Pierce's performance reviews were average from 2005 to 2008, she missed a sales target in 2008, showed only marginal performance in 2009 and 2010, missed a sales target in 2010, and her supervisors said that she would be placed on a performance improvement plan in 2011. *Id.* ¶¶ 69–73. During the last years of the custody proceeding, Pierce saw a social worker for counseling, pursuant to a court order. *Id.* ¶ 65. Pierce wasn't treated by a doctor, psychiatrist, or clinical psychologist, never received medication, and wasn't diagnosed with a mental illness. *See id.* ¶¶ 66–67; [61-1] at 144, Dep. at 42.

279, 288 (7th Cir. 2004) and citing *Dellenbach v. Letsinger*, 889 F.2d 755, 763 (7th Cir. 1989)).[14]

Courts apply a functional test to decide whether an official's role was equivalent to that of a judge. *See Nichols*, 442 Ill.Dec. at 449 (quoting *Cleavinger v. Saxner*, 474 U.S. 193, 202 (1985)). Relevant factors include (1) the need to assure that the individual can perform her functions without harassment or intimidation; (2) the presence of safeguards that reduce the need for damages actions as a means for controlling unconstitutional conduct; (3) the insulation from political influence; (4) the importance of precedent; (5) the adversarial nature of the process; and (6) the correctability of error on appeal. *Heyde v. Pittinger*, 633 F.3d 512, 517 (7th Cir. 2011) (citing *Butz*, 438 U.S. at 512). Immunity is not overcome by allegations of bad faith or malice, but officials can be held liable for their non-judicial actions and when their

---

[14] The doctrine of quasi-judicial immunity extends the same protection afforded to judges to other officials, *see Nichols v. Fahrenkamp*, 442 Ill.Dec. 444, 449 (2019); *Killinger v. Johnson*, 389 F.3d 765, 770 (7th Cir. 2004), which means that case law about how immunity applies to judges is helpful in understanding how quasi-judicial immunity applies to other officials. Pierce cites authority about other forms of immunity, *see* [67] at 9–22, but those doctrines aren't at issue here. Quasi-judicial immunity is different from Illinois protections for local government employees, *see* 745 ILCS 10/1, sovereign immunity, *see Senn Park Nursing Ctr. v. Miller*, 104 Ill.2d 169, 186–189 (1984), qualified immunity for civil rights violations, *see Saucier v. Katz*, 533 U.S. 194, 200–09 (2001); *Wood v. Strickland*, 420 U.S. 308, 321–22 (1975), prosecutorial immunity, *see Hampton v. City of Chicago*, 484 F.2d 602, 607–09 (7th Cir. 1973); *Hilliard v. Williams*, 465 F.2d 1212, 1217–18 (6th Cir. 1972); *Malley v. Briggs*, 475 U.S. 335, 341–42 (1986), or the immunity given to executive officers. *See Scheuer v. Rhodes*, 416 U.S. 232, 238–50 (1974). Plaintiff argues that Wilner caused a deprivation of Pierce's constitutional rights, *see* [67] at 17–21, but Pierce didn't bring a § 1983 claim in her complaint, *see* [2-1] at 2–32, and cannot amend her pleading in a brief opposing summary judgment. *See Speer v. Rand McNally & Co.*, 123 F.3d 658, 665 (7th Cir. 1997) (quoting *Shanahan v. City of Chicago*, 82 F.3d 776, 781 (7th Cir. 1996)). And a § 1983 claim would be time-barred because the events in question date to 2011. *See Woods v. Illinois Dep't of Children and Family Services*, 710 F.3d 762, 766 (7th Cir. 2013) (noting that § 1983 claims brought in Illinois are subject to a two-year statute of limitations).

actions, although judicial in nature, are taken "in the complete absence of all jurisdiction." *Mireles v. Waco*, 502 U.S. 9, 11–12 (1991) (citations omitted); *Killinger v. Johnson*, 389 F.3d 765, 770–71 (7th Cir. 2004).

The state court assigned Wilner to resolve disputes between Pierce and Addante and to make related recommendations, [56-1] at 44, 49, 196–97, the kind of discretionary tasks usually performed by a judge. *See Zoretic*, 832 F.3d at 643–44 (quoting *Synder*, 380 F.3d at 288). Parenting coordination called for an unbiased perspective (Wilner wasn't aligned with either party), which further associated Wilner with the judicial process. *See Nichols*, 442 Ill.Dec. at 450. There was a need for Wilner to coordinate Matthew's parenting free from harassment, intimidation, or political influence, she was subject to supervision and review by the state-court judge, had the guidance of preceding domestic law in Illinois, and was involved in the adversarial process of custody litigation. *See Heyde*, 633 F.3d at 517. While Illinois courts have yet to decide whether parenting coordinators qualify for quasi-judicial immunity, the parenting coordinator role in this case was functionally similar to that of a judge, and I predict the Illinois Supreme Court would apply quasi-judicial immunity to court-appointed parenting coordinators.[15] *See ADT Sec. Services, Inc. v.*

---

[15] Courts outside of Illinois have reached the same conclusion about parenting coordinators who performed similar functions. *See Jacob v. Ronayne*, Case No. 20-13370, 2022 WL 90852, at *5–7 (E.D. Mich. Jan. 7, 2022); *Babb v. Eagleton*, 614 F.Supp.2d 1232, 1238–43 (N.D. Okla. 2008); *Jallad v. Beach*, Case No. 16-2843, 2017 WL 3053992, at *3–4 (D. Kan. July 19, 2017); *Bechdoldt v. Loveland*, Civ. No. 10-1041-AA, 2011 WL 6020666, at *3–4 (D. Or. Nov. 30, 2011). It's true (as Pierce argues) that the parenting coordinator in *Jacob* was required to act in the best interests of the child, while Wilner may not have had that responsibility. *See Jacob*, 2022 WL 90852, at *3. But the parenting coordinator in *Jacob* was appointed to help implement court orders and resolve disputes, and was charged with the same kinds of

*Lisle-Woodridge Fire Prot. Dist.*, 672 F.3d 492, 498 (7th Cir. 2012) (noting that in the absence of guidance from the state's highest court, a federal court must predict how the Illinois Supreme Court would rule on an issue of state law).

Wilner was performing a judicial function when she prepared two reports about Pierce and Addante's parenting, made recommendations about changes in the custody arrangement, and participated in a pretrial conference. *See* [65] ¶¶ 32–33, 36–41, 44, 47–49; [70] ¶¶ 10–11, 13–17, 29; [56-1] at 260–64, 266–70. Summarizing the parenting relationship and making a recommendation to the child representative and the court about a change in the arrangement involved discretion: the same kind of analysis associated with a court. *See Zoretic*, 832 F.3d at 643–44 (quoting *Synder*, 380 F.3d at 288). Wilner was acting independently of any party to the case, and was associated with the judicial process when she made her reports and recommendations. *See Nichols*, 442 Ill. Dec. at 450.[16]

---

discretionary authority as Wilner. *See id.* (quoting Mich. Comp. Laws § 722. 27c(1)); *see also Zoretic v. Darge*, 832 F.3d 639, 643–44 (7th Cir. 2016).

[16] The cases cited by Pierce are distinguishable. The social workers in *Snell* weren't entitled to quasi-judicial immunity because their actions preceded the judicial process, and were analogous to an investigation by police. *See Snell v. Tunnell*, 920 F.2d 673, 690–92 (10th Cir. 1990). In *Hodorowski*, the Fifth Circuit found that judicial or prosecutorial immunity didn't shield social workers who removed children from the home of their parents without an earlier court order. *Hodorowski v. Ray*, 844 F.2d 1210, 1212–15 (5th Cir. 1988). The court in *Austin* found that immunity didn't apply when social workers filed an allegedly false complaint. *Austin v. Borel*, 830 F.2d 1356, 1361–63 (5th Cir. 1987). By contrast, Wilner's actions were all taken after she was appointed to a role by the court, Wilner answered to the state court judge, and she was charged with mediating some disputes between the parties, making her integral to the judicial process in a way that social workers performing tasks before court intervention are not. *See* [56-1] at 44, 49, 196–97. Unlike Wilner's discretionary role, the clerk in *Snyder* performed "purely ministerial" tasks, and was not acting in a functionally comparable way to a judge. *Snyder v. Nolen*, 380 F.3d 279, 287–89 (7th Cir. 2004).

13

Pierce argues that—because a local rule forbade parenting coordinators from making recommendations about child custody—Wilner acted without jurisdiction. *See* [67] at 11–12. An official acts in the clear absence of jurisdiction if, her court having been given jurisdiction only over certain types of issues, she decides another type altogether. *See Kowalski v. Boliker*, 893 F.3d 987, 997–98 (7th Cir. 2018) (quoting *Stump v. Sparkman*, 435 U.S. 349, 357 (1978)); *Bradley v. Fisher*, 80 U.S. 335, 352 (1871). But a quasi-judicial actor is immune "even if [her] exercise of authority is flawed by the commission of grave procedural errors," and doesn't act without jurisdiction "merely because [she] violates a procedural rule." *Killinger v. Johnson*, 389 F.3d 765, 770–71 (7th Cir. 2004) (citing *Stump*, 435 U.S. at 359, *Brokaw v. Mercer Cnty.*, 235 F.3d 1000, 1015 (7th Cir. 2000), and *John v. Barron*, 897 F.2d 1387, 1391 (7th Cir. 1990)). Exceeding authority is different than acting without jurisdiction, and isn't a reason to expose a judicial officer to suit. *See Killinger*, 389 F.3d at 770–71 (citations omitted); *John*, 897 F.2d at 1391 (citing *Stump*, 435 U.S. at 356–57).

The state court tasked Wilner with reporting parenting problems to the child representative and resolving some conflicts between the parties, and the local rule said that a parenting coordinator was to make recommendations to the court as necessary. *See* [56-1] at 44, 49, 196–97. Wilner's reports—which largely summarize problems in the parenting arrangement—were well within that mandate. *See id.* at 260–70. Her brief recommendations (a few sentences in much longer reports) that sole custody of Matthew be given to Addante likely violated the local rule and went

beyond her authority. But Wilner didn't act in the absence of all jurisdiction. Wilner was appointed parenting coordinator by a judge of the Circuit Court of Cook County, who had jurisdiction to allocate parental responsibilities. *See In re Marriage of Dobbs*, 358 Ill.App.3d 308, 310 (5th Dist. 2005) (citing *In re Marriage of Wojcicki*, 135 Ill.App.3d 248, 251 (1st Dist. 1985)); *In re Marriage of Casarotto*, 316 Ill.App.3d 567, 570 (1st Dist. 2000); 750 ILCS 5/601.2. Wilner had some jurisdiction in assessing parental responsibilities, and the court had more. *See Stump*, 435 U.S. at 356 n.6 (quoting *Bradley*, 80 U.S. at 351–52) ("[W]here jurisdiction ... is invested by law in the judge, *or in the court in which he holds*," errors in the manner and extent in which that jurisdiction is exercised aren't a reason to strip an officer of immunity.) (emphasis added).

The facts here are like those in *Hoey v. Hoey*, 2022 IL App (5th) 220054-U. Although *Hoey* is not precedential, it is helpful to predict how the Illinois Supreme Court would approach the issue. In that case, a guardian ad litem was appointed during divorce proceedings. *Id.* ¶ 4. While a statute confined the defendant to testifying or submitting written reports and a rule of professional conduct said that advocates at a trial shouldn't usually be allowed to testify as a witness, the defendant both testified and questioned witnesses at a hearing, independently filed motions with the court, and imposed parenting restrictions that weren't included in the court's order. *See id.* ¶¶ 6–9. The appellate court granted quasi-judicial immunity to the defendant. *Id.* ¶ 17. While the guardian ad litem exceeded her authority, the trial court found (and the court of appeals affirmed) that all of the conduct complained of

15

was within the scope of the defendant's appointment, and that the defendant had not acted in the absence of all jurisdiction. *Id.* ¶¶ 16–17; *see also Nichols v. Fahrenkamp*, 442 Ill.Dec. 444, 456–57 (2019).

The same is true here. Wilner made her reports after she had been appointed, at the request of the child representative in the case, pursuant to her responsibilities to monitor and report on the parties' parenting. Making custody recommendations exceeded Wilner's authority, but wasn't the kind of jurisdiction-less action that warrants exposing a judicial officer to suit. *See Golden v. Helen Sigman & Associates, Ltd.*, 611 F.3d 356, 361 (7th Cir. 2010) (finding that a child representative who allegedly made false statements on matters related to a custody proceeding "was still carrying out her responsibilities as a child representative"); *Vlastelica v. Brend*, 352 Ill.Dec. 791, 798–99 (1st Dist. 2011) (holding that a child representative's alleged bullying, limitation of visitation hours, lies to the court, and threats were within the course of the child representative's court-appointed duties because they occurred after the court's appointment "and in pursuit of his duties"); *Killinger v. Johnson*, 389 F.3d 765, 771 (7th Cir. 2004) (finding quasi-judicial immunity for a mayor when he failed to comply with statutory procedures); *Stump v. Sparkman*, 435 U.S. 349, 356 (1978) (citations omitted) (holding that immunity applies in cases of error or when an official acts in excess of his authority). *Cf. Kowalski v. Boliker*, 893 F.3d 987, 997–98 (7th Cir. 2018) (holding that a judge who inserted herself into a case proceeding before another judge acted in the clear absence of jurisdiction because she didn't have "at least a modicum of authority over matters arising from [the] case").

16

Pierce should not have had to contest with her parenting coordinator's recommendations. But the remedy for Wilner's error was in the court overseeing the custody dispute, not in a damages lawsuit. Defendants are entitled to quasi-judicial immunity.

### B. Breach of Contract

Even if defendants weren't immune to suit, plaintiff still couldn't recover. To prevail on her breach of contract claim, Pierce must show (1) the existence of a valid and enforceable contract; (2) plaintiff's performance; (3) defendant's breach; and (4) damages resulting from the breach. *Spitz v. Proven Winners N. Am., LLC*, 759 F.3d 724, 730 (7th Cir. 2014) (citation omitted); *Ivey v. Transunion Rental Screening Solutions, Inc.*, 2022 IL 127903 ¶ 28 (citation omitted). Pierce's claim in this case fails because she cannot show that the parties had a contractual relationship.

To show a valid and enforceable contract under Illinois law, Pierce must prove offer, acceptance, and consideration. *Kap Holdings, LLC v. Mar-Cone Appliance Parts Co.*, 55 F.4th 517, 522 (7th Cir. 2022) (citations omitted); *Melena v. Anheuser-Busch, Inc.*, 219 Ill.2d 135, 151 (2006). Consideration must be some detriment to the offeror, some benefit to the offeree, or some bargained-for exchange between them, and must be present on both sides of the agreement. *See Doyle v. Holy Cross Hosp.*, 186 Ill.2d 104, 112–13 (1999) (citation omitted); *Marque Medicos Fullerton, LLC v. Zurich Am. Ins. Co.*, 416 Ill.Dec. 190, 206 (1st Dist. 2017) (citation omitted).

"Illinois adheres to a 'four corners rule' of contract interpretation, which provides that '[a]n agreement, when reduced to writing, must be presumed to speak

the intention of the parties who signed it. It speaks for itself, and the intention with which it was executed must be determined from the language used." *Davis v. G.N. Mortg. Corp.*, 396 F.3d 869, 878 (7th Cir. 2005) (quoting *Air Safety, Inc. v. Teachers Realty Corp.*, 185 Ill.2d 457, 462 (1999)). But in this case the parties' written agreement wasn't an integrated document: it explicitly referenced the court order appointing Wilner. *See* [56-1] at 257. Because the agreement is capable of being understood in more than one sense—as a contract or as a document notifying Pierce of how the court order would be implemented—the parenting coordination agreement is ambiguous. *See Air Safety, Inc.*, 185 Ill.2d at 462 (citing *Farm Credit Bank of St. Louis v. Whitlock*, 144 Ill.2d 440, 447 (1991)). Given its relationship to the state court proceeding, the agreement is ambiguous as to whether the parties mutually intended to enter a contract, and I may consider parol evidence in determining the intent of the parties. *See Cannon v. Burge*, 752 F.3d 1079, 1088 (7th Cir. 2014) (citing *Farm Credit Bank of St. Louis v. Whitlock*, 144 Ill.2d 440, 447 (1991)); *see also TCFIF Inventory Finance, Inc., v. Appliance Distributors, Inc.*, Case No: 12 C 332, 2014 WL 806961, at *10 (N.D. Ill. Feb. 28, 2014) (citing *O'Brien v. Cacciatore*, 227 Ill.App.3d 836, 845 (1st Dist. 1992)) (noting that even where an agreement is otherwise unambiguous on its face, a party may introduce parole evidence to prove lack of consideration); Restatement (Second) Contracts § 214 cmt. c.

Pierce argues that Wilner promised to perform parenting coordination services in exchange for Pierce's promise to pay. *See* [67] at 25. Plaintiff contends that she could have used another parenting coordinator and that the court order didn't require

her to pay Wilner's fee or Wilner to provide services. *See id*. But that's not what the court order says.[17] The state court appointed Wilner to be parenting coordinator and ordered that Pierce and Addante pay for costs. *See* [65] ¶¶ 18, 21; [56-1] at 44, 49–50.

An essential part of consideration is a bargained-for-exchange of promises or performances. *See Boomer v. AT & T Corp.*, 309 F.3d 404, 416 (7th Cir. 2002); *Ross v. May Co.*, 377 Ill.App.3d 387, 391 (1st Dist. 2007) (citations omitted); Restatement (Second) of Contracts § 71 (1981). "A performance or return promise is bargained for if it is sought by the promisor in exchange for [her] promise and is given by the promisee in exchange for that promise." *Boomer*, 309 F.3d at 416 (quoting *Hartbarger v. SCA Services, Inc.*, 200 Ill.App.3d 1000, 1012 (5th Dist. 1990)).

In this case, there was an exchange of money for services between Wilner and Pierce. But that exchange wasn't bargained for. The court order created the exchange and didn't leave meaningful room for bargaining. Thus, unlike in the usual contract, it wasn't Wilner's promise to serve that induced Pierce's promise of payment, but instead the court's order that created this exchange. *See Borg-Warner Acceptance Corp. v. Dep't of State*, 433 Mich. 16, 21 (1989) (finding that "obligatory payment of a nominal fee for specific and mandatory acts by governmental agents" wasn't enough to convert a transaction into a contract, and that the fee was not bargained-for

---

[17] Given the agreement's relationship to the court's order, that Wilner characterized the agreement as a contract in a deposition, *see* [56-1] at 100, Dep. at 47, isn't decisive as to the parties' intent. Pierce argues that because Wilner stopped working on the case she wasn't required to perform parenting coordination services. *See* [67] at 26–27. But Wilner performed parenting coordination services pursuant to the order, and the fact that she may have stopped performing them doesn't show that the parties were motivated to enter into the agreement by something other than the court's order.

consideration); *Romero v. Buhimschi*, No. 2:06-cv-10859, 2009 WL 92226, at *6 (E.D. Mich. Jan. 14, 2009) ("[A] government employee who has discretion in his work is not, as a matter of contract law, free to make side bargains with third parties that will control the exercise of that discretion.") *Ndambi v. CoreCivic, Inc.*, 990 F.3d 369, 372 (4th Cir. 2021) (holding that detainees who worked in custodial detention could choose to participate in the program, but weren't free to bargain with their employers, because their work was merely a result of their custody); Restatement (Second) Of Contracts § 73 cmt. B ("A bargain by a public official to obtain private advantage for performing his duty is ... unenforceable as against public policy.").

Another way of understanding why consideration is missing here is that Pierce never promised to do anything that she wasn't already obligated to do. The court order said that Pierce was responsible for half of the costs associated with mediation performed by Wilner, [56-1] at 44, and for any costs that Pierce incurred. *See id.* at 50. In the agreement, Pierce promised to pay Wilner for her services. *See id.* at 257–58. Under the preexisting duty rule, agreement to perform what one is already obligated to do isn't valid consideration. *See Chicago Coll. of Osteopathic Med. v. George A. Fuller Co.*, 776 F.2d 198, 208–09 (7th Cir. 1985) (citations omitted); *BMO Harris Bank, N.A. v. Porter*, 423 Ill.Dec. 705, 717 (1st Dist. 2018) (citing *White v. Vill. of Homewood*, 256 Ill.App.3d 354, 357 (1st Dist. 1993)). Pierce's payment to Wilner was already required, which means there wasn't adequate consideration to create a contract. *See Marque Medicos Fullerton, LLC*, 416 Ill.Dec. at 206–07 (quoting *White*, 256 Ill.App.3d at 357); *BMO Harris Bank, N.A.*, 423 Ill.Dec. at 423; *Mulvey v. Carl*

*Sandburg High Sch.*, 408 Ill.Dec. 715, 723–24 (1st Dist. 2016); 3 Willison on Contracts § 7:4 (4th ed.).[18]

Defendants' retainer agreement was not an enforceable contract. It was a document giving notice to Pierce about how the parties would carry out the court's order. It was not the product of a bargained-for exchange imposing new obligations on Pierce. Without demonstrating consideration for the agreement, Pierce hasn't shown that any contract existed between her and defendants. Because Wilner is immune from suit and plaintiff's motion for summary judgment requires Pierce to prove the elements of a breach of contract, Pierce's motion fails for the reasons stated above. I do not address defendants' other arguments.

---

[18] In the agreement, Pierce also promised to "follow the parameters of the" agreement, "honor any additional agreements" reached with Wilner during meetings, and to attend sessions and engage in them with Matthew's best interests in mind. [56-1] at 258. Although not strictly required by the court order or local rule, these promises weren't consideration because they all derived from Pierce's existing legal obligations. *See Marque Medicos Fullerton, LLC v. Zurich Am. Ins. Co.*, 416 Ill.Dec. 190, 207 (1st Dist. 2017) (quoting *White v. Vill. of Homewood*, 256 Ill.App.3d 354, 357 (1st Dist. 1993)). This case isn't like those where a party promised to meet a higher standard than her preexisting duty to comply with the law because Pierce's promises under the agreement were all directly related to carrying out the court's order. *Cf. Dinerstein v. Google, LLC*, 484 F.Supp.3d 561, 589–90 (N.D. Ill. 2020) (quoting *Dolmage v. Combined Ins. Co. of Am.*, No. 14 C 3809, 2016 WL 754731, at *9 (N.D. Ill. Feb. 23, 2016)).

IV.     **Conclusion**

Defendant's motion for summary judgment, [59], is granted. Plaintiff's motion for summary judgment, [54], is denied. Enter judgment and terminate civil case.

ENTER:

_____
Manish S. Shah
United States District Judge

Date:  March 31, 2023